# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5992 | **DATE** | 7/9/2001 |
| **CASE TITLE** | Katrina Dyson vs. Larry Massanari | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in this memorandum opinion and order, both parties' Rule 56 motions for summary judgment are denied (11-1, 12-1) and Dyson's motion to remand is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | JUL 1 0 2001 | |
| | Notified counsel by telephone. | date docketed | 16 |
| ✓ | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| SN | courtroom deputy's initials | 01 JUL -9 PM 2:43 date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

DOCKETED
JUL 1 0 2001

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KATRINA DYSON, )
Social Security No. 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, )
)
Plaintiff, )
)
v. ) No. 00 C 5992
)
LARRY G. MASSANARI, Acting )
Commissioner of Social Security, )
)
Defendant. )

MEMORANDUM OPINION AND ORDER

Katrina Dyson ("Dyson") seeks judicial review pursuant to the Social Security Act (the "Act, more specifically 42 U.S.C. §§ 405(g) and 1383(c)(3)[1]) of the final decision of Commissioner of Social Security Larry Massanari ("Commissioner") denying Dyson's claim for supplemental security income ("SSI") disability benefits under Sections 1381a and 1382c(a)(3)(A). As is usual in these cases, both sides have moved for summary judgment under Fed. R. Civ. P. ("Rule") 56. In the alternative, Dyson has moved for a remand for further proceedings. For the reasons stated in this memorandum opinion and order, both parties' Rule 56 motions for summary judgment are denied and Dyson's motion to remand is granted.

---

[1] All further statutory references will take the form "Section--," using the Title 42 numbering rather than the Act's internal numbering. All portions of 20 C.F.R. will be cited "Reg. §--." All citations to Social Security rulings will take the form "SSR--." Finally, citations to Dyson's and Commissioner's respective memoranda take the form "D. Mem.--" and "C. Mem.--."

## Procedural Background[2]

On June 17, 1997 Dyson filed an application for SSI disability benefits due to obesity and breathing problems from asthma, the onset of which allegedly occurred on June 10, 1994 (R. 67, 93). That application was denied both initially and upon reconsideration (R. 26, 32). Dyson then requested and received a hearing (the "Hearing"), which took place before Administrative Law Judge ("ALJ") Robert Asbille on December 16, 1998 (R. 171).

On May 28, 1999 ALJ Asbille issued a decision denying Dyson's request for disability benefits (R. 17). ALJ Asbille found that although Dyson was incapable of performing her past relevant work, she was able to perform a significant number of jobs in the national economy, so that she was not disabled (R. 15-16).

On July 3, 1999 Dyson filed a request for review with the Appeals Council (see R. 5). Dyson claims to have submitted, as part of that request, new evidence in the form of x-rays of her knees that had been taken on June 23, 1999, about a month after ALJ Asbille's decision (see Attachments to Addendum to Dyson's Memorandum in Support of Her Motion for Summary Judgment). On July 28, 2000 the Appeals Council denied Dyson's request for review, making Commissioner's decision final (R. 5-6). Because

---

[2] What follows in the next sections of the text is drawn from the administrative record (cited "R. --").

2

that denial did not acknowledge receipt of the x-rays, Dyson asked the Appeals Council to reopen its decision on September 5, 2000. There is no indication that the Appeals Council ever responded to that request. On September 28, 2000 Dyson filed this action pursuant to Section 405(g).

## Dyson's Impairments

At the time she filed her initial application for disability benefits, Dyson, who is 5'5" tall, weighed about 365 pounds (R. 67). Dyson's application asserted that her obesity and asthmatic condition prevented her from working (R. 67, 93). Dyson provided few details about her asthmatic condition, saying only that it very often caused her shortness of breath (R. 93).

Although Dyson's initial application referred only to her obesity and asthma, through the course of her disability proceedings she has claimed to suffer from other impairments, and she has gradually gained weight during that time. Dyson's September 27, 1999 request for reconsideration said that in addition to the originally mentioned impairments, she also suffered from nose bleeds, chest pain, back pain due to her obesity and migraine headaches (R. 101-02). By the time Dyson appeared at the Hearing, she weighed 390 pounds, and for the first time she also complained of knee problems (R. 178, 184).

## Medical Evidence as to Impairments

Well before the Hearing Dyson had visited two doctors who

diagnosed her condition. First was Dyson's family doctor, Dr. Philip Maskall, while the second was Dr. Edith Panopio, who performed a consultative examination of Dyson at the request of the Social Security Administration ("SSA").

Dr. Maskall's August 1, 1997 report had diagnosed Dyson as having morbid obesity and mild bronchial asthma (R. 125) and said she could be well on her way to Pickwickian syndrome.[3] (R. 126). Dyson then weighed 360 pounds and had experienced asthma attacks once every four to six months, each lasting one to two days, followed by mild expiratory wheezing between attacks (R. 125). At that time Dyson used two inhalers and also took oral medication and a nose spray (R. 126). As to Dyson's ability to perform work-related activities, Dr. Maskall said she was "limited to low impact sedentary activities as a result of her morbid obesity," but her ability to travel was "unlimited" (R. 126). Although Dr. Maskall also mentioned that Dyson's morbid obesity might be compromising her pulmonary function (R. 126), a pulmonary function study conducted on July 30, 1997 proved normal (R. 127).

Next, on August 7, 1997 Dr. Panopio had described Dyson as severely obese and had observed that she was mouth-breathing (R.

---

[3] Merck Manual 60 (17th ed. 1999) lists "Pickwickian syndrome" as one possible consequence of obesity, describing it as a condition in which "impairment of breathing leads to hypercapnia, a reduced effect of $CO_2$ in simulating respiration, hypoxia, cor pulmonale, and a risk of premature death."

4

130). Despite that, the doctor's examination of Dyson's chest and lungs revealed no respiratory distress or prolonged expiratory phase (R. 131). Dr. Panopio found there was no evidence of neurological impairment relative to Dyson's claim of migraine headaches (R. 132-133). Notably in light of later developments, although Dyson then denied encountering any problems with her knees Dr. Panopio also diagnosed her as suffering from "mild knocked knee deformity" (R. 131-32). Finally, Dr. Panopio found Dyson had a limited range of motion in her lumbar spine and knees (R. 133).

To assist in Dr. Panopio's consultative examination, on August 6, 1997 x-rays had been taken of Dyson's lumbar spine. Those x-rays showed normal vertebral alignment, normal disc spaces and no significant arthritic changes (R. 134).

Several months later (on April 30, 1998) Dyson visited the University of Illinois Hospital emergency room for asthma exacerbation (R. 153). Although the record contains little detail with respect to that visit, she was apparently discharged on the same day and was instructed to return to see a doctor within the next day or two (id.).

Those had been the only items of prior medical evidence available for ALJ Asbille's consideration. But board-certified internist and endocrinologist Dr. Bernard Stevens appeared at the Hearing at ALJ Asbille's request to testify about Dyson's medical

5

situation (R. 175). Although Dr. Stevens provided little testimony, he did tell the ALJ that x-rays of Dyson's knees should be taken to complete the record (R. 184-85, reproduced verbatim):

> Those x-rays would be relevant, Judge, because the only thing they did, they took an x-ray of her lumbar spine and it didn't show any, any pathologic changes during a ferensic (Phonetic) examination that, that she had recently. She had her ferensic examine, well not that recent, it was August 7th of 1997. It was done at Consultative Examinations, Incorporated. The examiner, the -- Dr. Pohnokian (Phonetic) said that she denied any problems with her knees at that time. And I guess that's, per that denial, why they didn't do any x-rays of her knees but Dr. Pohnokian noted there was some deformity of her knees present. So I think to give her, her the full benefit of the process and due to the fact that her weight is -- greatly exceeds 909A tables for her height, it probably would not be a bad idea to get x-rays on her knees.

After the Hearing and pursuant to Dr. Stevens' recommendation, ALJ Asbille asked that Dr. Eric Tchaptchet perform a consultative examination, including the taking of knee x-rays and making a consequent diagnosis. Tchaptchet conducted that examination on January 12, 1999 (R. 155), when Dyson was seven months pregnant (id.). Dr. Tchaptchet made findings as to Dyson's asthma (no acute findings during the examination), her migraine headaches (no acute findings) and her back problems (Dyson would benefit from losing weight, and she was able to walk 50 feet without an assistive device) (R. 158). His report found "no limitation of motion of any joint," but he did not specifically address her knees (R. 157), nor because of her

6

pregnancy did he take any x-rays (R. 158).

### Dyson's Hearing Testimony

During the December 16, 1998 Hearing Dyson appeared before the ALJ without representation. ALJ Asbille questioned Dyson briefly about herself and as to how her impairments affected her ability to work. Dyson testified that she was 25 years old and (as stated earlier) was 5'5" and weighed 390 pounds (R. 177). She said she had two children (ages 7 and 4) and had a tenth-grade education (R. 178-79). She further told ALJ Asbille that she had last worked in 1987, acting as a cook and cashier at a pizzeria for a period of about six months (R. 179). Dyson said she used a cane to help her walk because of back and knee pain, although a doctor had not prescribed its use (R. 178).

Dyson also provided limited testimony about her daily activities, saying that she spent her days sitting, watching television and reading (R. 182). Dyson reported that it was difficult for her to walk because she would become short of breath and her back would hurt (R. 180). According to her testimony, because of those symptoms the farthest she had walked in the month before the Hearing was a half-block, after which time she needed to use her inhaler (R. 181-82). Dyson testified that she could stand for no more than approximately five minutes at a time and could not bend over to pick things up off the floor (R. 182). She said her back pain felt better only when she sat

down or when she walked in a bent-over position (R. 181). Dyson further testified that she had no difficulty sitting for a long period of time or using her hands or fingers (R. 182). She also said she could lift a gallon of milk, but she had trouble lifting her arm to try to comb her hair for a long period of time and she had difficulty performing basic hygienic functions (R. 182-83).

### Testimony of Vocational Expert

Vocational expert William Schweihs ("Schweihs") testified at the Hearing. In principal part he responded to two hypothetical questions posed by ALJ Asbille.

In the first hypothetical, ALJ Asbille asked Schweihs to assume an individual of the same age, education and past work experience as Dyson and then posed this inquiry (R. 187-88):

> Assume further that I were to find from the medical evidence that claimant can perform the universe of exertional or nonexertional work. And assume that I find for hypothetical number one that the claimant can lift 10 pounds occasionally, 5 to 10 pounds frequently, can stand as much as 30 minutes at a time for a total of 2 hours a day, has no problem sitting, can perform the posturals on an occasional basis and there's no restriction in gross or fine manipulation. Further the claimant has a non-exertional impairment that she needs to work in a dust free, or an environment where there's no heavy concentrations of dust, fumes or smoke.

Schweihs responded that such a claimant could not return to her past relevant work but that there would be approximately 4,000 to 5,000 cashier positions, 3,000 to 4,000 security monitor positions and 3,000 receptionist positions available (R. 188-89).

ALJ Asbille's second hypothetical question posited such a

8

claimant who (R. 189):

> still can lift ten pounds occasionally, 5 to 10 pounds frequently, and can only stand 5 to 10 minutes at a time and can stand for less than an hour a day total, walk only half a block, can never climb stairs, can never reach down to pick up something off the ground, and basically can't perform any of the posturals, and there's no problems with gross or fine manipulation and the same environmental restrictions [as the claimant in hypothetical number one].

Schweihs answered that a claimant with those restrictions would be limited to 700 to 800 security monitor positions, 400 to 500 receptionist positions and 300 to 400 lobby attendant positions (R. 189-90).

### Dyson's Lack-of-Substantial-Evidence Claim

Dyson must suffer from a disability to be eligible for benefits. "Disability" is defined in pertinent part as the inability (Section 423(d)(1)(A)):

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995) (citations omitted) sets out the customary five-step inquiry prescribed by Reg. § 404.1520 to determine whether a claimant is disabled:

(1) whether the claimant is currently employed;
(2) whether the claimant has a severe impairment;
(3) whether the claimant's impairment meets or equals one of the impairments listed by the SSA, see 20 C.F.R. § 404, Subpt. P, App. 1;
(4) whether the claimant can perform her past work; and

9

> (5) whether the claimant is capable of performing work in the national economy.
>
> If a claimant satisfies steps one, two, and three, she will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy.

If a disability determination reaches step five, the ALJ must discharge Commissioner's burden of proof either by applying the Medical Vocational Guidelines (the "grid") or through the use of a vocational expert (Herron v. Shalala, 19 F.3d 329, 336-37 (7th Cir. 1994).

ALJ Asbille denied Dyson's claim at the fifth and final step of the sequential analysis, holding that although Dyson had satisfied steps one, two and four, Commissioner had then met his burden of establishing that Dyson was capable of performing work in the national economy. In so ruling the ALJ relied on Schweihs' response to the first hypothetical question. As ALJ Asbille put it (R. 16):

> The vocational expert cited 4-5,000 cashier jobs, 3,000 security/monitor jobs, and 3,000 receptionist jobs [that Dyson could perform] which represent a significant number of job opportunities in the metropolitan Chicago area.

Dyson challenges that finding on the basis that the residual functional capacity ("RFC") of that hypothetical claimant was less restrictive than Dyson's.

Although an ALJ may rely on the testimony of a vocational

10

expert to discharge Commissioner's burden at step five, the hypothetical question upon which such testimony is predicated "must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record" (Herron, 19 F.3d at 337). Here Dyson is correct in arguing that ALJ Asbille relied on testimony based on hypothesizing an individual whose RFC was not as restrictive as hers in several respects.[4]

For one thing, ALJ Asbille's premise that Dyson could stand for up for 30 minutes at time for a total of 2 hours a day has no basis whatever in the record. Instead Dyson testified that she could stand for no more than 5 minutes at a time (R. 182), and no other evidence contradicts that assertion. Second, the ALJ's RFC determination did not account for certain aspects of Dyson's complaints, such as her asserted inability to walk for more than half a block or to climb stairs. Again there was no evidence to

---

[4] It is well-established that to facilitate a court's ability to assess the reasonableness of an agency decision, "the agency must articulate a satisfactory explanation for its actions that includes a rational connection between the facts found and the choice made" (Madison Gas & Elec. Co. v. United States EPA, 25 F.3d 526, 529 (7th Cir. 1994), quoting earlier Supreme Court decisions). ALJ Asbille's decision runs dangerously close to violating that principle, as evidenced by Commissioner's difficulty in articulating a definitive statement as to the ALJ's determination of Dyson's RFC (see C. Mem. 13, 14). But because it is reasonable to conclude that the ALJ equated Dyson's RFC with that of the claimant in his first hypothetical, this opinion reviews ALJ Asbille's decision on that basis. As discussed below, however, even that generous reading does not allow this Court to uphold Commissioner's decision.

the contrary, and ALJ Asbille's RFC determination essentially ignored Dyson's statements.[5] Finally, the ALJ himself found that Dyson needed to shift positions at will (R. 16), but he did not factor that need into either hypothetical question. In sum, ALJ Asbille's reliance on Schweihs' vocational testimony in response to the first hypothetical question was totally inadequate to discharge Commissioner's step five obligation. That decision plainly cannot be upheld.

That leaves the question of the appropriate remedy: whether to remand for further proceedings consistent with this opinion, or whether (as Dyson claims) she is entitled to SSI benefits as a matter of law. In that respect, if a record does not contain substantial evidence supporting the denial of benefits and if reopening the record could not support a finding of no disability in any event, an award of benefits rather than remand for a rehearing is appropriate (Coffman v. Bowen, 829 F.2d 514, 519 (4th Cir. 1987)). But contrary to Dyson's contention, here the record does not indisputably support her claim for SSI benefits, so she too is not entitled to summary judgment.

This is essentially Dyson's position:

---

[5] As to both of the just-discussed matters, it is of course true that an ALJ can reject a claimant's version on credibility grounds. But that does not carry with it the power to manufacture alternative factual findings out of whole cloth, as the ALJ did here. Moreover, in this instance the ALJ's stated determination as to Dyson's credibility was itself patently defective--more on this subject later.

12

1. Any claimant with the RFC of the individual in the ALJ's second hypothetical question could not perform a significant number of jobs in the national economy.

2. Dyson's RFC is *more* restrictive than that of the hypothesized individual.

But Dyson's first difficulty is that her initial premise is flawed: According to Schweihs, an individual with the RFC described in the ALJ's second hypothetical scenario could perform between 1,400 and 1,700 jobs--and Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993) teaches that 1,400 is "a significant number of jobs" as a matter of law.[6]

Dyson also urges that she is entitled to summary judgment because her RFC is more restrictive than that of the second hypothetical claimant. In that respect she contends that even if it is assumed that the hypothetical claimant could perform a significant number of jobs, it must be recognized that ALJ Asbille found Dyson has the need to shift position at will--a need not factored into either of the ALJ's hypotheticals.[7] She cites SSR 96-9p in support of her claim that such a need could further erode her already limited occupational base, thus

---

[6] Although Dyson attempts to get mileage out of ALJ Asbille's apparent belief that such a number would not be significant (R. 191), such a belief cannot carry any weight in the face of Lee.

[7] Commissioner does not dispute ALJ Asbille's finding that Dyson has the need to shift position at will.

13

compelling a finding of disability.

But this Court's role is limited to that of judicial review, not one of independent factfinding. It cannot make its own determination as to whether and to what extent that additional condition further eroded Dyson's occupational base. As 96-9p instructs, the appropriate action in such instances is to obtain the testimony of a vocational expert on that issue. Hence Dyson's Rule 56 motion is also denied in favor of a remand.

### Dyson's Failure-To-Develop-the-Record Claim

Because a remand is required in any event, Dyson's claims that ALJ Asbille failed both (1) to obtain a valid waiver of Dyson's right to representation and (2) to develop a full and fair record in accord with the duty owed by ALJs to unrepresented litigants cannot affect that result. But a few words in those respects are still necessary, because Dyson's criticisms point the way to a better handling of the case on remand.

Where as here a disability benefits claimant is unassisted by counsel, the ALJ himself or herself must "scrupulously and conscientiously probe into, inquire of and explore for all relevant facts..." (Binion v. Shalala, 13 F.3d 243, 245 (7th Cir. 1994), quoting Smith v. Secretary of Health, Education & Welfare, 587 F.2d 857, 860 (7th Cir. 1978)). And where as here a claimant

has not validly waived her right to counsel,[8] the burden of proving that the record was developed fully and fairly rests on Commissioner (id.).

In this instance there are at least two deficiencies in the way the ALJ developed the record that derogated from a full and fair hearing. Those flaws must be corrected on remand.

First, ALJ Asbille reached his no-disability decision without the benefit of x-rays of Dyson's knees. It is difficult to understand why he did so, for both Dr. Stevens and the ALJ himself recognized the importance of such x-rays in making the disability determination (R. 15, 184-85, 191).[9] Thus the ALJ was playing with less than what he himself had characterized as needed to make up a full deck.

Whenever the report from a consultative examination is inadequate or incomplete, the ALJ needs to obtain the missing

---

[8] At the Hearing, ALJ Asbille did inform Dyson generally of her right to counsel and had her sign a waiver, but he did not comply with the directive in Binion, 13 F.3d at 245 to advise her of the specific factors enumerated there as necessary to ensure a pro se claimant's valid waiver of the right to representation. And although Dyson also received a letter informing her of her right to counsel, that letter failed to advise her of the 25% cap on attorneys' fees described in Binion. On that score Thompson v. Sullivan, 933 F.2d 581, 584-85 (7th Cir. 1991)(relied on in Binion) held that such an omission in a nearly identical letter (in combination with the ALJ's failure to advise claimant of his rights orally) resulted in an invalid waiver. It follows that Dyson's waiver of counsel was similarly invalid.

[9] Indeed, the ALJ's opinion candidly stated that without the x-rays of Dyson's knees "it is impossible to tell whether Listing 9.09 is met here" (R. 15).

15

information from the medical source (Reg. §416.919p(b)). And when a good reason (in this instance Dyson's pregnancy) accounts for the absence of a test necessary for a disability determination at a consultative examination, then the ALJ needs to schedule another consultative examination (Reg. § 416.918(a)).

Hence the proper procedure here would have been for ALJ Asbille to have waited until Dyson's pregnancy had been completed, and then to reorder another consultative examination to obtain the x-rays of her knees. As stated earlier, such x-rays were in fact taken before the case reached the Appeals Council. Those x-rays must be considered on remand in accordance with SSR 00-3p (on all fours, see Smith v. Apfel, 231 F.3d 433, 437-38 (7th Cir. 2000)).[10]

Second, Dyson correctly points to the impropriety of the ALJ's stated determination as to Dyson's credibility. Even apart from his impermissible creation of factual findings that differed from Dyson's testimony and that totally lacked any record support (see text at n.5), ALJ Asbille's credibility determination consisted entirely of his conclusory statement that he found Dyson "generally credible, but not to the extent alleged" (R. 14). That statement directly flouts the mandate of SSR 96-7p:

---

[10] Although Listing 9.09 has been deleted, SSR 00-3p provides that the condition of a claimant's joints in combination with her obesity retains its relevance throughout the sequential disability determination. Thus the deletion of Listing 9.09 does not affect the need for the ALJ to consider that evidence.

16

> 5. It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

It is difficult even to speculate as to the meaning or effect of the ALJ's amorphous statement that Dyson was not credible "to the extent alleged," for he provided no explanation, nor did he develop the record as SSR 96-7p required. That error too must not be repeated on remand.

## Conclusion

Because neither party is entitled to judgment as a matter of law, their cross-motions for summary judgment are denied. Dyson's alternative motion to remand is granted under sentence four of Section 405(g) (see Melkonyan v. Sullivan, 501 U.S. 89, 97-102 (1991)) for:

1. consideration of the x-rays of Dyson's knees as they may bear upon step three of the sequential disability determination under the principles of SSR 00-3p and, if that consideration still leaves Dyson unsuccessful at step three so that the analysis must proceed to step five,

2. a more reasoned assessment of Dyson's credibility, which the ALJ may find requires taking more testimony from

Dyson as to her daily activities,

    3. a more adequate articulation of Dyson's RFC and

    4. the taking of new evidence from a vocational expert as to whether and to what extent Dyson's need to shift at will would further erode her occupational base.

One final point is unfortunately--and painfully--obvious from all that has been said here. It is difficult to conceive that the same ALJ, even assuming the best of wills on his part (and without impugning his good faith), could carry out the obligation to produce the required full and fair record on remand. Just as our Court of Appeals did in <u>Sarchet v. Chater</u>, 78 F.3d 305, 309 (7th Cir. 1996), and because of the same concerns, this Court urges Commissioner to transfer the case to a different ALJ on remand (see also <u>Clifford v. Apfel</u>, 227 F.3d 863, 874 (7th Cir. 2000)).

                                              */s/ Milton I. Shadur*
                                            Milton I. Shadur
                                            Senior United States District Judge

Date: July 9, 2001